## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **SHERRY J. OSHIVER,**<br><br>**Plaintiff,**<br><br>v.<br><br>**GALE NORTON,**<br><br>**Defendant.** |

**Civil Action 00-02284 (HHK)**

## MEMORANDUM OPINION

Plaintiff, Sherry Oshiver, brings this action against her former employer, the Department of the Interior ("Interior"), alleging that Interior discriminated against her on the basis of age, religion, and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and retaliated against her for complaining about Interior's allegedly discriminatory conduct. Presently before the court is Interior's motion to dismiss or, in the alternative, for summary judgment [#146].[1]  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted.

## I.  FACTUAL BACKGROUND

Oshiver is a Jewish female who, at the time she filed her first complaint in this court on September 25, 2000, was 48 years old.  She began her employment with the U.S. Bureau of

---

[1]     Oshiver filed three complaints against Interior in this court.  *Oshiver v. Norton*, Civ. No. 00-2284 ("*Oshiver I*"); *Oshiver v. Norton*, Civ. No. 00-2935 ("*Oshiver II*"); *Oshiver v. Norton*, Civ. No. 01-1893 ("*Oshiver III*").  The three civil actions were consolidated prior to the filing of Interior's motion to dismiss or, in the alternative, for summary judgment, which seeks dismissal of all claims alleged in all three complaints.

Mines ("USBM"), a bureau within Interior, on or about April 19, 1993.  During the course of her

employment at USBM, Oshiver received numerous positive performance ratings.

In its Fiscal Year 1996 Appropriations Act for Interior, Congress directed that USBM be

closed.   Following this decision, a Closure Team was established to plan and carry out the

logistical and administrative tasks associated with USBM's orderly closure.  Oshiver was not

selected to serve on the Closure Team.

As a result of USBM's closure and the subsequent reduction-in-force ("RIF"), Oshiver

and almost 350 other employees were separated from USBM effective February 3, 1996.  At the

time of her separation, Oshiver was a GS-14 Regulatory Analyst.  After being informed of the

pending RIF, but before the RIF was effective, former USBM employee John Bennett was

appointed to a term position in Interior's Bureau of Land Management ("BLM") as a GS-14

Economist, a position for which Oshiver had applied.

On February 3, 1996, the same day that Oshiver was separated from USBM, she was

appointed to a thirteen-month term position as a GS-13 Regulatory Analyst at BLM.  Before

accepting the position, Oshiver was informed that this position was a term position and would

not exceed thirteen months.  In May and July of 1996, Oshiver's supervisors at BLM became

aware that she had filed a previous administrative complaint against Interior alleging

employment discrimination.  Soon after, in the summer of 1996, two GS-11 term attorney

positions became available in Oshiver's division at BLM.  These positions were excepted service

positions, meaning that pursuant to Office of Personnel Management regulations they were

excluded from the competitive civil service procedures.  5 C.F.R. pt. 213.  Oshiver was neither

informed nor selected for either of these positions.  By letter dated September 24, 1996, BLM

reminded Oshiver that her appointment with BLM was for a limited term only and informed her

that the term would not be extended due to budgetary restrictions.

On January 31, 1997—prior to the expiration of her term BLM appointment— Oshiver

received a career reinstatement appointment as a GS-14 Congressional Liaison and Legislative

Specialist at the Office of Congressional Liaison ("OCL") within the U.S. Geological Survey

("USGS"), another bureau within Interior.  Soon after receiving this appointment, Oshiver's new

supervisor, Timothy West, first became aware of Oshiver's previous EEO activity.

In August of that year, Oshiver received a memorandum of counseling from West, which

sought to bring to Oshiver's attention concerns about "certain conduct and behavior" that West

found "unacceptable and [was] adversely impacting" OCL.  Def.'s Mot., Exh. 24 at 1.  That same

year, West did not award Oshiver a bonus.  In February 1998, West appointed Joseph Briskey, a

male geologist who did not work in OCL, to serve as the Acting Chief of OCL during West's

absence, a position which Oshiver had previously held on occasion.  West also denied Oshiver

the opportunity to serve on two different details, one month-long detail in 1997 and another year-

long detail in 1998.

Oshiver received extensive progress reviews in August 1998 and May 1999.  The May

1999 progress review outlined West's concerns with Oshiver's behavior and performance and

informed Oshiver that, absent immediate improvement, West would consider all administrative

options available to him, including removal.  In December 1999, West gave Oshiver a "results

not achieved" performance rating for FY 1999.  As a result of this rating, Oshiver was placed on

a Performance Improvement Plan ("PIP") in January 2000.  Oshiver was also informed in

January 2000 that she would not receive a bonus for FY 1999.  In May 2000, having allegedly

failed to meet the requirements of the PIP, West proposed Oshiver's removal.  Oshiver's second-

line supervisor at the time, Barbara Wainman—who had become aware of Oshiver's previous

EEO activity in February 2000—approved West's proposal and removed Oshiver from federal

service for unacceptable performance, effective June 27, 2000.

In a letter dated March 4, 2001, Oshiver requested that Robert Lamb, the Acting Assistant

Secretary of Policy, Management, and Budget at Interior, overturn the removal decision.  Lamb

declined to do so by letter dated March 9, 2001.

## II. ANALYSIS

### A. Plaintiff's Disparate Treatment Claims

In this action, Oshiver seeks relief under Title VII and the ADEA.[2]  Title VII makes it

unlawful for an employer to discriminate against an individual on the basis of, *inter alia*, race,

---

[2]      Interior has filed a motion to dismiss or, in the alternative, for summary judgment as to
each of Oshiver's claims.  Because the court looks to materials outside the pleadings in resolving
the motion, the court will treat the motion as one for summary judgment.  *See Zuurbier v. MedStar
Health, Inc.*, 306 F. Supp. 2d 1, 5 (D.D.C. 2004).
         The standard for summary judgment is familiar.  Under Fed. R. Civ. P. 56, summary
judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on
file, and affidavits show that there is no genuine issue of material fact in dispute and that the
moving party is entitled to judgment as a matter of law.  Material facts are those "that might
affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-
movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.
The non-moving party's opposition must consist of more than mere unsupported allegations or
denials and must be supported by affidavits or other competent evidence setting forth specific
facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(e); *Celotex Corp. v.
Catrett,* 477 U.S. 317, 323–24 (1986).  The non-moving party is "required to provide evidence
that would permit a reasonable jury to find" in its favor.  *Laningham v. United States Navy*, 813
F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly
probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

religion, or sex.  42 U.S.C. § 2000e-16(a).  The ADEA prohibits an employer from discriminating

against an individual with respect to the terms of her employment on the basis of that individual's

age, 29 U.S.C. § 623(a)(1), a protection applying to workers 40 years of age and older.  *Id.* §

631(a).  Both statutes also prohibit an employer from retaliating against an employee for

participating in protected equal employment opportunity ("EEO") activity, such as the filing of

an administrative complaint of discrimination.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an

unlawful employment practice for an employer to discriminate against any of his employees . . .

because [the employee] has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing"); *see also* 29 U.S.C. § 623(d).

     Absent direct evidence of discrimination or retaliation, Oshiver's claims under both Title

VII and the ADEA require analysis under the ubiquitous burden-shifting framework first set forth

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *see also Hall v. Giant

Food, Inc.*, 175 F.3d 1074, 1077–78 (D.C. Cir. 1999) (applying *McDonnell Douglas* factors to

ADEA claims).  Under this approach, the plaintiff bears the burden of making a *prima facie* case

of discrimination or retaliation by bringing forth facts sufficient "to create a reasonable inference"

that the plaintiff's status as a member of a protected class, such as religion, sex, or age, "was a

factor in the employment decision at issue." *Krodel v. Young,* 748 F.2d 701, 705 (D.C. Cir.

1984).  If the plaintiff successfully meets this burden, she creates a rebuttable presumption that

the defendant employer unlawfully discriminated against her. *Teneyck v. Omni Shoreham Hotel*,

365 F.3d 1139, 1151 (D.C. Cir. 2004).  The burden then passes to the defendant to articulate a

"legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802.

Once the defendant has done so, "the ultimate question . . . is whether intentional discrimination

may be inferred from all the evidence before the trier of fact." *Teneyck*, 365 F.3d at 1151.  Such evidence includes the plaintiff's *prima facie* case, any evidence the plaintiff presents to rebut the employer's assertedly nondiscriminatory rationale for its actions, and "any further evidence of discrimination that may be available to the plaintiff." *Id*.

To establish a *prima facie* case of disparate treatment discrimination, the plaintiff must show:  (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *See id.* at 1150; *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  One method by which a plaintiff can satisfy the third prong of the *prima facie* test of discrimination is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class.  *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).  Alternately, at least for failure to hire claims, an inference of discrimination also exists when a plaintiff demonstrates that her "rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant:  an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977).  As the Supreme Court has noted, "[e]limination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.*

To establish a *prima facie* case of retaliation, the plaintiff's burden is slightly different. The plaintiff must show:  (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse personnel action; and (3) that a causal connection existed between the two. *Brown*, 199 F.3d at 452; *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984).

In her complaints, Oshiver alleges thirteen different incidents[3] of disparate and retaliatory treatment:  (1) non-selection to serve on USBM's Closure Team; *Oshiver II*, Compl. ¶¶ 7, 10–11; *Oshiver III*, Compl. ¶ 7; (2) non-selection for a GS-14 Economist term position at BLM, *Oshiver II*, Compl. ¶ 12; (3) Interior's failure to renew Oshiver's term position at BLM, *Oshiver I*, Compl. ¶¶ 11, 12; (4) Interior's failure to inform Oshiver that vacant term positions at BLM existed, *id.* ¶ 13; (5) denial of two requests to participate in detail assignments, *Oshiver II*, Compl. ¶ 16; *Oshiver III*, Compl.  ¶¶ 23, 33; (6) non-selection as Acting Chief of OCL in February 1998, *Oshiver II*, Compl. ¶ 17(2d)[4]; (7) denial of a bonus for work performed in 1997, *id.* ¶ 17; (8) "derogation and degradation" of her duties at USGS by her supervisors, *Oshiver III*, Compl. ¶¶ 14,16; (9) Interior's alleged refusal to approve leave for attorney consultation regarding her EEO complaints, *id.* ¶ 19; (10) a purportedly "improper and unjust" mid-year review in May 1999, *id.* ¶¶ 24, 25, a "results not achieved" rating for the FY 1999 performance period, *id.* ¶ 26, and placement on a Performance Improvement Plan ("PIP") in January 2000, *id.* ¶ 28; (11) denial of a bonus for work performed in 1999, *id.* ¶ 20; (12) removal from her position at USGS, *id.* ¶ 31; and (13) Interior's failure to remedy an allegedly incomplete and biased investigation regarding her EEO complaints, *id.* ¶ 35, and refusal to reverse the removal decision, *id.* ¶¶ 37, 38.

---

[3]     In their papers, the parties discuss twenty-six different acts of discrimination and retaliation.  Many of these allegations, however, involve similar or overlapping factual assertions and are consolidated by the court in this opinion for organizational purposes.

[4]     In *Oshiver II*, two different paragraphs are numbered 17.

The parties do not dispute that, as a Jewish woman over the age of forty who engaged in protected EEO activity, Oshiver is a member of a protected class under both Title VII and the ADEA, satisfying the first element of her *prima facie* case for both her discrimination and retaliation claims. The parties do, however, dispute whether Oshiver has met her burden of establishing the other elements of a *prima facie* case for most of her claims, as well as whether she has demonstrated, when appropriate, that Interior's legitimate nondiscriminatory reasons for its actions were pretextual. The court will address each dispute in turn.

### 1. Non-Selection for USBM's Closure Team

In the FY 1996 Appropriations Act for Interior, Congress directed the "orderly closure of the Bureau of Mines." H.R. Rep. No. 104-259, at 36 (1995) (Conf. Rep.). While some activities within USBM were identified by Congress for transfer to other Interior bureaus and to the Department of Energy, "[a]ll other functions of the Bureau of Mines [were to] be terminated and all other Bureau locations [were to] be closed." *Id.* As a result, Oshiver's position, along with those of almost 350 other employees, were scheduled to be abolished. On November 6, 1995, Interior notified Oshiver by letter that she had been identified for separation because her position would not be transferred to another Interior bureau. Def.'s Mot., Exh. 5.

Following Congress's decision to close USBM, a team was established to carry out the logistical and administrative tasks associated with the agency's closure. The Closure Team Director, Robert Doyle, selected a small group of approximately fifty USBM employees with "specific current knowledge, skills, and abilities related to the functions being terminated." *Id.*, Exh. 57 at 2. In his declaration, Doyle stated that "[b]ecause of the short time [allowed for USBM's closure], it was important to retain those employees most familiar with the subject

8

matter, current Bureau business, and the specific functional processes necessary to carry out

closure." *Id.* Doyle did not select Oshiver to serve on the Closure Team because she did not

work in any functional area—such as personnel, property, procurement, budget, or records

management—and therefore "would not have been as familiar with the current work load and

related closure requirements as the incumbents who were performing the work as part of their job

responsibilities." *Id.*

Oshiver contends that she was separated from her positions via the RIF "because she was

retaliated against, when USBM refused to select her for the Closure Team." Pl.'s Opp'n at 10.[5]

Specifically, she argues that "[h]ad she been selected for the Closure Team the RIF would not

involved [sic] her." *Id.* Whether this is true is irrelevant,[6] for Oshiver has failed to satisfy her

burden of establishing a *prima facie* case of retaliation with regards to the decision not to select

her for the Closure Team because she has failed to introduce any evidence that Doyle, the person

responsible for selecting the Closure Team, had knowledge of Oshiver's prior EEO activity when

he made his decision. In his affidavit, Doyle indicates that he did not learn of Oshiver's

administrative EEO complaints until the summer of 1996, many months after he selected the

Closure Team. Def.'s Mot, Exh. 55 at 1. Failing to introduce any evidence to the contrary,

Oshiver has not established the causation prong of a *prima facie* case of retaliation. *See Mitchell*

---

[5]     Oshiver does not contend that her separation from USBM via the RIF was itself
discriminatory or retaliatory, nor does she contend that the failure to appoint her to the Closure
Team was discriminatory.

[6]     In its reply brief, Interior disagrees with Oshiver's suggestion that, had she been placed on
the Closure Team, she would have avoided the RIF. *See* Def's Reply at 2–3 ("Eventually, all
USBM's employees—regardless of whether the employees were on the closure team—were
separated via reduction-in-force ("RIF") or transferred to another agency or office of
Defendant.").

*v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985) (to establish causation, the plaintiff must show *inter alia*, that the decisionmakers were aware of the plaintiff's participation in protected activity); *Manning v. Chevron Chem. Co. LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003) ("Although the plaintiff's burden at the *prima facie* stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of his protected activity.").  Interior, therefore, is entitled to summary judgment on this claim.

*2.  Non-Selection for a GS-14 Economist Term Position*

On February 3, 1996, the day after she was officially separated from her position at USBM, Oshiver was appointed to a 13-month term position as a GS-13 Regulatory Analyst at BLM.  At or about the same time that Oshiver was hired for this position, another former USBM employee, John Bennett, was appointed non-competitively to a term position as a GS-14 Economist.  Bennett, unlike Oshiver, was a male and had never engaged in protected EEO activity.  Oshiver was not selected for this position and claims that she was more qualified than Bennett.  As a result, she alleges that she was the victim of sex discrimination and retaliation. *Oshiver II*, Compl. ¶¶ 12, 20.

The decision to hire Bennett was made solely by W. Hord Tipton, who indicates in his affidavit that, at the time he made the decision to hire Bennett, he "was not aware that Ms. Oshiver had participated in the EEO process."  Def.'s Mot., Exh. 64 at 3.  Oshiver never disputes this.  For this reason, Oshiver has failed established a *prima facie* case of retaliation with regards to this claim.  *Mitchell*, 759 F.2d at 86; *Manning,* 332 F.3d at 883 n.6.

Oshiver has, however, satisfied her burden of establishing a *prima facie* case of sex discrimination; she was a member of a protected class, she suffered an adverse employment

action by not being hired for the Economist position, and an inference of discrimination exists because she was treated differently than a similarly situated employee who was not part of her protected class.

Interior suggests that an inference of sex discrimination is not appropriate given its assertion that Oshiver and Bennett were not similarly situated. Def.'s Mot. at 22. While Interior acknowledges that both Oshiver and Bennett were GS-14 employees who were separated from USBM by RIF and were listed on Interior's Re-Employment Priority ("RPL") list, Interior nonetheless argues that the two are dissimilarly situated because Bennett was in a higher subgroup on the RPL list than Oshiver and therefore had superior rights to placement in the Economist position than Oshiver. *Id.* In response, Oshiver asserts that this distinction is irrelevant because the subgroup status did not *require* that Bennett be selected instead of Oshiver. Pl.'s Opp'n at 11. Moreover, there is no evidence that this distinction was a factor in the decision to hire Bennett over Oshiver.[7] For these reasons, the court agrees with Oshiver and concludes that Bennett and Oshiver are sufficiently similar so as to create an inference of sex discrimination with regards to this claim.[8]

---

[7]    Tipton states that "[e]ven if [Oshiver] had been qualified for the position, she *should* not have gotten it rather than Mr. Bennett since . . . Mr. Bennett was IB, and Ms. Oshiver was IIB" and therefore lower ranked on the RPL list. Def.'s Mot., Exh. 64 at 2–3 (emphasis added). This statement does not indicate that this distinction actually played a role in his decision to hire Bennett and fails to undermine the important similarities between Oshiver and Bennett.

[8]    In this regard, the court observes that it was not necessary, in any event, for Oshiver to show that she was treated differently than a similarly situated employee who was not part of her protected class in order to establish a prima facie case. As discussed previously, such a showing is one method, but not the only method, of demonstrating a circumstance that gives rise to an inference of discrimination. *See George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).

11

Interior insists that it had a nondiscriminatory reason for hiring Bennett for the Economist position instead of Oshiver.  Namely, Tipton indicates in his affidavit that Bennett was more qualified than Oshiver for the position given his Ph.D. in Economics, his more than fifteen years as an Economist, his previous experience as a GS-14 Economist at USBM, and the fact that he was working on project matters that BLM wished to continue.  Def.'s Mot., Exh. 64 at 2.  Tipton also states that he was in need of an employee who had experience with the Abandoned Mine Waste Working Group activities and with Western Governor's issues.  Id.  Since Oshiver was allegedly "not qualified" in this respect and Bennett was, Tipton opted to hire Bennett.  Id.[9]

In response, Oshiver contends that her multiple graduate degrees in business and law demonstrate that she was qualified for the position.  This assertion fails to rebut Interior's nondiscriminatory reasons for not hiring Oshiver.  It does not address Tipton's belief that Bennett was more qualified for this particular position nor does it give rise to a reasonable inference that discrimination was the real reason underlying the employment decision.  Moreover, it is well-established that "the plaintiff's opinion of the relative merits of her credentials as opposed to those of the selected individuals are irrelevant." *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 150 (D.D.C. 1998); *see also Aka v. Washington Hospital Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) (for a legitimate inference of discrimination to exist, the fact finder must be able to conclude that the plaintiff was "significantly better qualified for the job" but was not selected);

[9]      Tipton also indicates that Oshiver had told him she was not interested in a position in his directorate.  Def.'s Mot., Exh. 64 at 3.  Oshiver, however, claims that a reasonable jury "could determine that Ms. Oshiver demonstrated her interest in the position by applying for it, submitting to an interview, and not withdrawing that application."  Pl.'s Opp'n at 11.  Notably, she never disputes that she told Tipton in the course of the interview that she was not interested.  Regardless, even if a dispute were to exist as to this point, it would not affect the court's decision and is therefore not material.

*Fishbach v. D.C. Dep't of Correction*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Short of finding that the employer's stated reason was indeed pretext . . . the court must respect the employer's unfettered discretion to choose among qualified candidates."). For these reasons, Interior is entitled to summary judgment as to this claim.

### 3. Failure to Renew Oshiver's Term Position at BLM

When Oshiver was hired at BLM as a GS-13 Regulatory Analyst in February 1996, she was informed that the position was a term position that would not exceed thirteen months. The pertinent Office of Personnel Management ("OPM") regulations state that "[t]he employment of a term employee ends automatically on the expiration of his term appointment unless he has been separated earlier in accordance with this chapter." 5 C.F.R. § 316.303. In September 1996, Oshiver received a letter from the Human Resources department that her term appointment would not be renewed due to "budget restrictions." Def.'s Mot., Exh. 20. Oshiver was never removed from this position, however, because prior to the expiration of the term, Oshiver was appointed to a GS-14 Congressional Liaison and Legislative Specialist position at OCL.

Oshiver argues that the letter from Interior informing her that her position was not to be extended due to budgetary reasons constitutes discrimination and retaliation on the bases of her religion, age and previous EEO activity (of which her supervisors were aware). Interior responds by contending that the letter reminding Oshiver that her term position would not be extended is "*not* a personnel action that adversely affected an employment-related entitlement of Plaintiff." Def.'s Mot. at 10 (emphasis in original). The court agrees with Interior. To be considered an adverse employment action, a letter from an employer must *itself* affect the terms, conditions, or privileges of the Oshiver's employment. *Harris v. Potter*, 310 F. Supp. 2d 18, 21 (D.D.C. 2004).

Oshiver never contends that the notification letters cost her pay or benefits, effected a change to her job title or responsibilities, altered her work hours, or otherwise affected "any material matter" of her employment. Accordingly, Interior is entitled to summary judgment on this claim.

    *4. Failure to Inform Oshiver of the Existence of Certain Vacant Term Positions*

    Approximately midway through the course of her term employment at BLM, two GS-11 excepted service term positions became available in BLM's Land Group. Pursuant to OPM regulations, these excepted term positions were not subject to the normal competitive civil service procedures and were, accordingly, not advertised to the public. *See* 5 C.F.R. pt. 213. Because her supervisors did not inform her about these vacancies, Oshiver did not apply and was not selected. Rather, Interior selected two other individuals, both of whom were younger than Oshiver, non-Jewish, and had not filed previous EEO complaints.

    Oshiver contends that she was discriminated against on the bases of her age and religion and retaliated against for filing EEO complaints when Interior failed to inform her of, or appoint her to, one of the two GS-11 term appointments at BLM. *Oshiver I*, Compl. ¶¶ 11–18. Oshiver does not contend that Interior had any obligation to inform her about these positions. Instead, she states that the fact that Interior "hides behind that absence of a regulatory obligation to offer or consider Ms. Oshiver for a position does not change that fact that the denial of an employment opportunity is an adverse employment action." Pl.'s Opp'n at 4. It is far from clear that the failure to inform Oshiver of the vacant positions constitutes an adverse employment action. Even assuming *arguendo* that this is true, and assuming that it gives rise to an inference of discrimination or retaliation sufficient to establish a *prima facie* case, Interior is entitled to

summary judgment nonetheless because Oshiver has failed to introduce any evidence that Interior's nondiscriminatory reasons for its failure to inform Oshiver were pretexts for discrimination.

BLM's Deputy Director requested approval, which the Solicitor's Office at Interior granted, to establish the two GS-11 attorney term positions at issue.  Both Kristina Clark, Assistant Solicitor, and Annetta Cheek, Oshiver's second-line supervisor, recommended the two individuals who ultimately received the appointments, Christopher Fontecchio and Erica Petacchi, based on their prior "exceptional performance" as paralegals in the office.  Def.'s Mot., Exh. 53, ¶ 6.  Cheeks indicated in her affidavit that she did not inform Oshiver of the vacant positions because:  (1) she "needed employees in addition to Ms. Oshiver to perform work on the regulatory reform project," *id.* ¶ 7; (2) she found Oshiver to be "somewhat difficult to work with," *id.* ¶ 8; and (3) Oshiver had already expressed "much unhappiness" about being down-graded from a GS-14 to a GS-13 position and, for this reason, Cheeks assumed she would not be interested in a GS-11 position.  *Id.* ¶ 9.  Ultimately, based on Cheeks's and Clark's recommendations, Ray Brady, Oshiver's supervisor at the time,  selected Fontecchio and Petacchi for the positions.

Oshiver fails to introduce any evidence to suggest that these legitimate nondiscriminatory reasons for not informing Oshiver of the vacant positions were pretextual.  Her conclusory statements that "a reasonable finder of fact" could "conclude Ms. Oshiver was being summarily rejected for other reasons" beyond those given by Cheeks in her affidavit, Pl.'s Opp'n at 7, are

insufficient to survive Interior's motion for summary judgment.[10]  To paraphrase the D.C.

Circuit, Oshiver, "who had the ultimate burden of persuasion, offered nothing beyond her own

speculations and allegations to refute [Interior's] legitimate non-discriminatory reasons for its

decisions," *Brown*, 199 F.3d at 458, and "a plaintiff's mere speculations are 'insufficient to

create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and

avoid summary judgment.'" *Id.* at 458–59 (quoting *Branson v. Price River Coal Co.*, 853 F.2d

768, 772 (10th Cir. 1988)).  Accordingly, because Oshiver is incorrect that any competent

evidence was presented from which a reasonable jury could conclude that Interior intentionally

discriminated or retaliated against her by not informing her of these excepted service positions,

Interior is entitled to summary judgment on this claim.

    5.  *Denial of Requests to Participate in Two Detail Assignments*

    Oshiver requested that she have the opportunity to participate in a detail assignment at

Interior's office in Washington, D.C., but was rejected by West in July 1997, because she was

allegedly "sorely needed" at OCL.  *Oshiver II*, Compl. ¶ 16.   In June 1998, Oshiver was denied

the opportunity to participate in another detail, this one being a one-year congressional detail in

_____

[10]     Instead of introducing admissible evidence to rebut Interior's asserted legitimate
nondiscriminatory reasons for the employment actions of which Oshiver complains, Oshiver
often simply states that a reasonable jury could find in her favor.  These *ipse dixit* assertions,
which are repeated throughout Oshiver's opposition, suggest that Oshiver fails to understand her
burden at this stage of the litigation—namely, to introduce admissible evidence that demonstrates
that a genuine issue remains for trial.

Washington, D.C.  *Oshiver III*, Compl. ¶ 23.[11]  Oshiver alleges that these denials were unlawful

because they amount to retaliation and discrimination on the bases of sex, age, and religion.

Oshiver has failed to establish a *prima facie* case of retaliation with regards to these

denials.  To meet her burden of establishing the causation prong of a retaliation *prima facie* case,

Oshiver relies solely on the fact that West had knowledge of her prior EEO activity.  However,

knowledge alone is not sufficient to establish causation.  *Hazward v. Runyon*, 14 F. Supp. 2d

120, 124 (D.D.C. 1998).  Rather, some other evidence, such as a close temporal relationship

between the supervisor becoming aware of the protected activity and the adverse employment

action, must be present.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per

curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient evidence of causality to

establish a *prima facie* case uniformly hold that the temporal proximity must be *very close*.")

(quotations omitted and emphasis added); *Mitchell*, 759 F.2d at 86 ("The causal connection

component of the *prima facie* case may be established by showing that the employer had

knowledge of the employee's protected activity, and that the adverse personnel action took place

*shortly after* that activity") (emphasis added); *Willingham v. Gonzales*, 391 F. Supp. 2d 52, 61

---

[11]      Oshiver also alleges that, around the same time that she was denied the chance to
participate in the second detail, West denied Oshiver "training and networking opportunities"
that were given to other employees.  *Oshiver III*, Compl. ¶ 22.  Oshiver fails to explain what
these "training and networking opportunities" were.  Moreover, she never indicates who, if
anyone, was permitted to participate in them.  To the extent that this vague allegation is different
than her more specific allegations that she was denied detail assignments, summary judgment is
appropriate.  General unsubstantiated allegations cannot form the basis of an independent
discrimination claim.  *See Dancy v. Am. Red Cross*, 972 F. Supp. 1, 3 (D.D.C. 1997) ("The
evidence presented in support of this claim, however, consists only of Plaintiff's vague,
unsubstantiated allegations and is, therefore, insufficient.").

(D.D.C. 2005) (noting that "[t]his Court has often followed a three-month rule to establish

causation on the basis of temporal proximity alone."). Oshiver has neither accounted for the

significant time between her supervisors' awareness of her protected EEO activities and the

denial of these "career-enhancing" opportunities,[12] nor has she presented any other evidence from

which this court could infer causation. This failure precludes the establishment of a *prima facie*

case of retaliation as to these incidents.

Beyond allegations of retaliation, Oshiver also alleges that the denial of these "career-

enhancing opportunities" constitutes improper discrimination on the basis of sex, religion and

age. *Oshiver II*, Compl. ¶¶ 16, 17(2d); *Oshiver III*, Compl. ¶ 23. Interior responds by arguing

that none of these denials was an "adverse employment action" and therefore Oshiver has failed

to establish a *prima facie* case of discrimination. The court disagrees. "[A] denial of training

may rise to the level of an adverse employment action," *Freedman*, 255 F.3d at 765, particularly

where the denials "could affect her future promotional opportunities." *Bowie v. Ashcroft*, 283 F.

Supp. 2d 25, 33 (D.D.C. 2003). Oshiver certainly argues that each of these denials affected her

---

[12]     West denied the first detail in the middle of July 1997, more than four months after first
learning of Oshiver's EEO activity. He denied the second detail in June 1998, more than fifteen
months after learning of Oshiver's EEO activity. These time periods exceed the three-month cut-
off adhered to by D.C. courts. *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C.
2004) (referring to end of the three-month window as "outer limit" of "temporal requirement in a
retaliation case").

There is some indication in the parties' briefs that Oshiver continuously filed
administrative complaints of discrimination from 1996 until 1999. *See, e.g.*, Def.'s Mot. at 2
(stating that Oshiver filed at least twelve administrative complaints). However, nowhere in the
record of this case was the court able to find any evidence regarding the specifics of these
subsequent complaints, including their allegations, the dates they were filed, and the dates when
Oshiver's supervisors became aware of them. It is conceivable that the three-month window for
establishing the causation prong for Oshiver's various retaliation claims would be restarted upon
West's knowledge of each subsequent complaint. However, Oshiver's failure to introduce any
evidence regarding these later complaints prevents the court from considering this option.

future promotional opportunities when she states that the details "dramatically increase[] the participant's knowledge of the workings of the agency and provided access to key personnel on Capitol Hill in a variety of situations."  Pl.'s Opp'n at 8.  Interior does not contest this assertion. Reviewing the evidence in plaintiff's favor, as the court must at this stage of the litigation, the court is satisfied that Oshiver has met her burden of demonstrating that the denial of these "career-enhancing" opportunities constituted adverse employment actions.

Interior also suggests that Oshiver has failed to establish a *prima facie* case of discrimination because she has not identified similarly situated individuals who were allowed to participate in these opportunities.  To suggest than an inference of discrimination exists, Oshiver cites the fact that two other individuals, both of whom were men, were approved for similar details.[13]  However, Oshiver does not dispute that neither of these two detail requests were granted by West, Oshiver's supervisor.  Because Oshiver has submitted no evidence that West ever approved a detail assignment for anyone*, other than Oshiver,*[14] under his supervision, there can be no inference that his decision to deny Oshiver permission to participate in the two details was discriminatory.  *See Cones v. Shalala*, 199 F.3d 512, 517 (D.C. Cir. 2000) (when evaluating

---

[13]     Oshiver testified in her deposition that Kurt Dodd, a male employee in the same Directorate as Oshiver who was either GS-13 or GS-14 and who worked on budget matters like Oshiver, was permitted to participate in a detail to Interior in 1998.  Def.'s Mot, Exh 75, at 84:6–86:1.  She also stated that Casey Stemler, a male employee at Interior, was granted the opportunity to participate in the one-year congressional detail.  *Id.* at 142:16–147:6.

[14]     The only detail that the record indicates West ever approved was for Oshiver herself, undermining her claim that the later denial was discriminatory.  West approved a 60-day detail for Oshiver to the Bureau of Reclamation in early 1997, prior to her requested month-long detail to Interior's D.C. office.  Def.'s Mot., Exh. 66 at 5.  Although the record is unclear, it appears that this previous detail was approved *after* West became aware of Oshiver's previous EEO activity, thereby also undermining any claim she has that her subsequent denial was retaliatory.

19

the third prong of a *prima facie* case of discrimination claim, the court "ask[s] whether a similarly situated person . . . requested *and received* the benefit [the plaintiff] sought.") (citing *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981) (emphasis added).

      6.   *Non-Selection as Acting Chief of OCL*

In February 1998, Oshiver was denied the opportunity to serve as Acting Chief of OCL during the absence of West, her supervisor, and she claims that this denial was both retaliatory and discriminatory. *Id.* ¶ 17(2d).  As with the denials of Oshiver's detail requests, Oshiver has failed to establish the causation element of a *prima facie* case of retaliation as to this assertion because she has neither accounted for the year that passed between West's becoming aware of her previous EEO activity in early 1997 and this alleged employment action nor has she introduced any other evidence to suggest that the denial was causally related to her prior protected activity. *Breeden*, 532 U.S. at 273–74; *Willingham*, 391 F. Supp. 2d at 61.

Oshiver has, however, established a *prima facie* case of discrimination as to this allegation.  Because Oshiver's assertion that "being selected as Acting Chief provides the participant with invaluable experience as a leader and manager within the agency" and would "distinguish[] her resume from other candidates for promotion, hire, or transfer, or an unexpected reduction in force,"  Pl.'s Opp'n at 8, remains uncontested, the court is satisfied that her non-selection qualifies as an adverse employment action.

Moreover, Oshiver has demonstrated that West hired a similarly-situated person who was not in her protected class to serve as Acting Chief of OCL.  Specifically, West hired Joseph Briskey, a male geologist from another division whose grade was "about the same" as Oshiver's, for the Acting Chief position. Def.'s Mot., Exh. 75, at 86:21–88:14.  Interior argues that Briskey

was not similarly situated.  This argument, however, is completely undermined by the fact that

Oshiver had previously been appointed Acting Chief of OCL on numerous occasions.  Def.'s

Mot., Exh. 66 at 4.  In light of this information, the court is hard pressed to conclude that Oshiver

is *not* similarly situated and accordingly concludes that Oshiver has met her burden of

establishing a *prima facie* case of sexual discrimination with regards to West's decision to

appoint Joseph Briskey as Acting Chief.

While Oshiver presents a *prima facie* case of discrimination, Oshiver fails to rebut

Interior's nondiscriminatory reasons for not appointing her.  She has introduced no evidence to

suggest that Interior's reasons are untrue, much less that they are pretexts for intentional

discrimination.  Specifically, she presented nothing to undermine West's reasons for appointing

Briskey instead of Oshiver.[15]  Absent either evidence to support that these reasons were

pretextual or other affirmative evidence that West was motivated by discriminatory bias,

summary judgment is appropriate.

### 7.  Denial of Bonus in 1997

Oshiver did not receive a bonus or award for the work she performed in 1997, which

Oshiver asserts was because of her previous EEO activity.  *Oshiver II*, Compl. ¶ 17.  However,

---

[15]     West testified that, although Oshiver had frequently been Acting Chief in his absence, the USGS was "beginning a crucial legislative period" in February 1998 and he was concerned that Oshiver's limited congressional experience would negatively impact the office.  Def.'s Mot., Exh. 66 at 4.  He indicated that Briskey was selected in her place "during this critical period" because he "was the most experienced and qualified individual [he] knew of in a position to serve the Agency."  *Id.* at 5.  Specifically, Briskey had worked for two years on Capitol Hill for a Senator who served on the committee with jurisdiction and oversight over USGS.  *Id.* at 4.  From prior interactions, West found Briskey "to be extremely knowledgeable with the right sensitivities and abilities to handle difficult congressional matters."  *Id.*  Briskey also wrote three "authoritative" articles about communicating with Congress.  *Id.* at 5.

despite Oshiver's allegations, summary judgment is appropriate as to this claim because, like those previously discussed, Oshiver has failed to establish the causation prong of a *prima facie* case of retaliation.  As discussed above, West first became aware of Oshiver's protected EEO activity in early 1997.  His decision to deny Oshiver a bonus for the work she performed in 1997 was made in December 1997.  Def.'s Mot., Exh. 72 at 28.  While mere temporal proximity between an employee's protected activity and an adverse employment action can sometimes give rise to an inference of causation, such temporal proximity must be closer than the time that is at issue here.  *Breeden*, 532 U.S. at 273–74; *Willingham*, 391 F. Supp. 2d at 61.  Because the adverse employment decision occurred almost a year after West became aware of Oshiver's prior protected activity, and because Oshiver has introduced no other credible evidence to give rise to an inference of retaliation, summary judgment in favor of Interior is proper on this claim.

        *8. Alleged "Derogation and Degradation" of Duties at USGS By Oshiver's Supervisors*

        Oshiver alleges that "within weeks" of her supervisors becoming aware of her previous EEO activity, she was given a "tremendous amount of clerical-type work not in accordance with her position description with artificial deadlines that could not be met."  *Oshiver III*, Compl. ¶ 14.  She also alleges that West gave her regular work to his other employees and that he closely scrutinized her work, "seeking mistakes."  *Id.*

        While these allegations might be relevant for purposes of Oshiver's hostile work environment claims, discussed *infra*, they do not constitute adverse employment actions and therefore cannot serve as the basis of a disparate treatment claim of retaliation or discrimination under Title VII or the ADEA.  To qualify as sufficiently adverse, an employment action must effect "a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits." *Brown*, 199 F.3d at 456.  For this reason, "changes in assignments and

work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by

a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549,

1557 (D.C. Cir. 1997) (listing cases).  To make a claim based on a change or reduction in

responsibilities, "a plaintiff must show that the change in duties resulted in a loss of pay, benefits

or promotion possibilities, or resulted in a change in position that was not as 'high profile.'"

*Keeley v. Small*, 391 F. Supp. 2d 30, 44 (D.D.C.  2005) (quoting *Gasser v. Ramsey*, 125 F. Supp.

2d 1, 5 (D.D.C. 2000)).  "Mere inconvenience and alteration of job responsibilities will not rise

to the level of adverse action." *Childers v. Slater*, 44 F. Supp. 2d 8, 19 (D.D.C. 1999).  As

Oshiver has not alleged that this asserted "derogation and degradation" of her duties in any way

affected the material terms of her employment, summary judgment is appropriate.

 9.  *Refusal to Approve Administrative Leave*

On April 4, 2000, Oshiver requested administrative leave for that afternoon, so that she

could consult with her attorney about EEO matters.  Oshiver's second-line supervisor, Barbara

Wainman, did not grant Oshiver's request.  Oshiver claims that this denial "showed her

retaliatory and discriminatory intent." *Oshiver III*, Compl. ¶ 19.  Whether this allegation is true

or not, Wainman's refusal to allow three hours of administrative leave was not an adverse

employment action as defined under the relevant case law and cannot form the basis of a

disparate impact claim under either Title VII or the ADEA.  *Ware v. Billington*, 344 F. Supp. 2d

63, 76 (D.D.C. 2004); *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004).[16]

  *10.  Negative Performance Review and Placement on a Performance Improvement Plan*

  On May 5, 1999, West gave Oshiver an oral mid-year progress review regarding

deficiencies in her work product.  This review was later documented in a May 20, 1999

memorandum that outlined West's concerns with Oshiver's behavior and the manner in which

she performed her duties.  Def.'s Mot., Exh. 30.  This memorandum provides incredible detail

regarding West's concerns, including over twenty pages of examples as to how Oshiver's work

had been deficient, including dates and excerpts from relevant documents to support his

conclusions.  West concluded the voluminous review by stating:

> In summary, my overall evaluation of your performance at this time is that you are
> in danger of not meeting your critical results and you are not fulfilling your role at the
> GS-14 level.  This is not the first time I have brought deficiencies to your attention;
> however, you improved after notification so I do not think your poor performance is
> due to a lack of knowledge or an inability to do the work.  Rather, I believe it is your
> unwillingness to accept full responsibility for the performance of the full range of
> your duties.

*Id.* at 21.  On June 9, 1999, Oshiver's second-line supervisor signed another memorandum that

stated that this progress review met USGS's requirements. *Id.*, Exh. 31.

  At the end of 1999, West prepared a summary rating of Oshiver's performance for the

previous year, as required by USGS policy.  West described Oshiver's overall performance and

gave her a "results not achieved" rating in two areas of her performance plan.  Def.'s Mot, Exh.

---

[16] Despite the fact that this allegation is not in itself an adverse employment action, it is
nonetheless relevant for purposes of determining whether Wainman had retaliatory motive with
regards to any other adverse employment actions for which she was responsible.

37.  West claims that this rating was not based on anything other than his personal observations of Oshiver's performance and her failure to improve since the May 1999 progress review session. *Id.*, Exh. 67 at 3.

Both USGS policy and guidelines, as well as Interior's Guidance on Performance Appraisals, require that any employee whose performance merits a "results not achieved" rating must be placed on a Performance Improvement Plan ("PIP").  Def.'s Mot, Exhs. 38, 39. Accordingly, following her performance review, Oshiver was placed on a PIP in January 2000. In the memorandum explaining the PIP, Oshiver received detailed information concerning her deficiencies, how she could improve her performance, and how West would assist her in bringing her performance to an acceptable level.  *Id.*, Exh. 40.

Oshiver argues that the negative progress review, the "results not achieved" rating, and the PIP placement constitute discrimination and retaliation in violation of both Title VII and the ADEA.  These actions, by themselves, are not necessarily sufficiently adverse so as to give rise to a *prima facie* case of discrimination or retaliation.  The D.C. Circuit, citing a "thick body of precedent," has rejected "the notion that formal criticism or poor evaluations are necessarily adverse actions."  *Brown*, 199 F.3d at 458; *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir. 1996) (stating that while there "are certainly cases where allegedly undeserved performance evaluations have been presented as evidence of discrimination on the basis of sex or age, [there is not] a single case where adverse employment ratings alone were found to constitute adverse action.").  The D.C. Circuit has also indicated that placement on a PIP is not, in and of itself, an adverse employment action.  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("We

therefore conclude that neither Taylor's placement in the PIP nor the delay of her performance

evaluations was an adverse employment action upon which Taylor may base a claim of

discrimination.").

Moreover, performance reviews and probationary actions do not constitute independent

adverse employment actions simply because the employer later follows through and terminates

the employee. *Cruz v. Snow*, 2005 U.S. Dist. LEXIS 19977, at *19 (D.D.C. Sept. 6, 2005);

*Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997) (noting "the long-held rule

that Title VII's anti-retaliation provision refers to ultimate employment decisions, and not to an

'interlocutory or mediate' decision which can lead to an ultimate decision"); *Page v. Bolger*, 645

F.2d 227, 233 (4th Cir. 1981) (same); *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549,

1555 (D.C. Cir. 1997) (avoiding the issue of whether such mediate decisions constitute adverse

employment actions). Rather, to be considered an adverse employment action, these decisions

must *themselves* affect the terms, conditions, or privileges of Oshiver's employment. *Cruz*, 2005

U.S. Dist. LEXIS 19977, at *19; *Brown*, 199 F.3d at 458. Having failed to present any evidence

that the negative reviews and placement on a PIP had any immediate tangible impact on her,

Oshiver has failed to establish a *prima facie* case of either discrimination or retaliation.

Notably, even if the court were to conclude that the negative reviews and PIP placement

were adverse employment actions, ostensibly because they led to Oshiver's ultimate dismissal,

the court would nonetheless grant summary judgment in Interior's favor. After a careful review

of the record, the court finds that there is no genuine dispute as to whether the performance

reviews and the placement on a PIP were the result of anything other than legitimate

nondiscriminatory reasons. Interior extensively detailed the performance-related incidents that

26

led to the negative reviews and the subsequent PIP placement, and Oshiver has failed to introduce anything, other than her own speculation, that suggests that these reasons were pretextual. *Brown*, 199 F.3d at 459.

   *11. Denial of 1999 Bonus*

   In late January 2000, West informed Oshiver that she would not be receiving a bonus for the work she performed in 1999. Oshiver alleges that her work merited a bonus and that West's refusal to award one constitutes retaliation and discrimination on the basis of age or religion.[17]

   As with the denial of the 1997 bonus, Oshiver has failed to establish a *prima facie* case of retaliation as to this claim because she has not demonstrated that the bonus denial was causally connected to Oshiver's discrimination complaints. West allegedly became aware of Oshiver's most recent EEO complaint in February 1999, when he was interviewed by an EEO investigator, Pl.'s Opp'n, Exh. 20. This occurred almost one year prior to his decision not to award Oshiver a bonus for 1999. This, alone, cannot satisfy Oshiver's burden of establishing the causation prong of a *prima facie* case of retaliation. *Breeden*, 532 U.S. at 273-74.

   Oshiver stated in her deposition that West gave bonuses for FY 1999 to other employees, all of whom were under the age of forty and were not Jewish. Def.'s Mot., Exh. 75 at 134:4–137:13. However, the other employees who allegedly received bonuses were not similarly situated to Oshiver, primarily because Oshiver was at a higher grade level, was expected to perform higher level functions, and had been subjected to numerous negative reviews. Having not provided any other evidence to support Oshiver's claims of discrimination, the court

---

[17]    Oshiver does not allege that she suffered discrimination on the basis of sex when West denied her a bonus for the work she did in 1999. Def.'s Mot., Exh. 75 at 135.

concludes that Oshiver has failed to establish a *prima facie* case of discrimination with regards to West's decision not to give a bonus to Oshiver for the work she performed in 1999. *Holbrook*, 196 F.3d at 261.

However, even assuming *arguendo* that Oshiver established a *prima facie* case of discrimination on the bases of age or religion, summary judgment is nonetheless appropriate in light of Interior's legitimate nondiscriminatory reasons for denying the bonus, all of which are supported by specific evidence in the record. Specifically, Interior cites the poor performance reviews, the "results not achieved" rating for 1999, and the placement on a PIP, all of which are discussed above, for its decision not to award Oshiver a bonus for her work in 1999. Def.'s Mot. at 38. Oshiver never rebuts this evidence with credible evidence. Nor does she meet her burden of persuasion that there is a triable issue of fact as to whether the denial was due to her religion or her age. Accordingly, the court grants summary judgment as to this claim.

*12. Removal*

On May 12, 2000, after her PIP period had ended, Oshiver received a memorandum from West, Def.'s Mot., Exh. 42, which indicated that, due to her "unacceptable performance," West was proposing that she be removed from her position at OCL. The memorandum exhaustively listed West's particularized complaints with Oshiver's performance. After requesting and receiving an extension to respond to this memorandum, Oshiver submitted her response on June 9, 2000, presenting her arguments as to why her performance did not merit removal. Oshiver also suggested in her response that West's proposal to remove was retaliatory for her previous

EEO activity.[18]  More than two weeks later, on June 26, 2000, Wainman issued her Decision to

Remove memorandum, which indicated that, after "carefully review[ing] the material that

formed the basis for the proposal [and] giv[ing] full consideration to the written response that

[Oshiver] provided," Wainman had decided to remove Oshiver.  *Id.*, Exh. 46 at 2.

Oshiver alleges that her removal constituted improper and illegal retaliation for her

previous EEO activity.[19]  As for this claim, Oshiver has met her burden of establishing a *prima*

*facie* case of retaliation.  It is undisputed that she participated in protected EEO activity and that

her removal qualifies as an adverse employment action.  Furthermore, there is arguably a close

temporal proximity between Oshiver's EEO activity and the employment action such that the

causation prong is established.[20]  Moreover, Oshiver has also submitted other evidence to

---

[18]     After filing the written response, Oshiver requested that she be allowed to meet with
Wainman to discuss West's proposal to remove.  Wainman, who was out of town, suggested that
they talk via telephone the following day and asked Oshiver to contact her to set up a time for the
call.  Oshiver never contacted Wainman and no telephone conference took place.

[19]     While Oshiver's complaint alleges that her removal was the result of "retaliatory and
discriminatory intent," *Oshiver III*, Compl. ¶ 31, Oshiver never explains the grounds upon which
she believes she was discriminated.  In fact, every supporting statement in her complaint, as well
as those in her response to West's proposal to remove, focus solely on West and Wainman's
retaliatory, as opposed to discriminatory, actions.  Given Oshiver's often imprecise use of the
word "discrimination" to encompass her alleged retaliatory treatment, the court does not read
Oshiver's complaint to allege that her dismissal was based on anything other than retaliation.
        Moreover, had Oshiver alleged that her termination was the result of discrimination,
summary judgment would nonetheless be appropriate.  Oshiver has not presented any competent
evidence that another similarly-situated individual outside of her protected class was treated
differently than she was.  For example, she has not alleged that an employee with similar poor
performance reviews who was not Jewish, who was younger, or who was male, was *not*
removed.  Nor has she produced any other evidence that gives rise to any legitimate inference of
discrimination on the basis of religion, sex, or age.

[20]     As discussed above, West became aware of Oshiver's most recent administrative
complaint in February 1999, more than a year before he proposed Oshiver's removal.  Wainman,
however, became Oshiver's second-line supervisor in October 1999 and learned of the Oshiver's

establish her *prima facie* case of retaliation.  First, as mentioned above, Wainman refused to approve administrative leave for Oshiver on April 4, 2000—less than three months before removing her—so that she could meet with her attorney about EEO matters.  Second, Oshiver presents an email from Wainman to Oshiver, dated March 17, 2000, which stated that Oshiver's refusal to meet with Wainman and West "may have an adverse impact on the outcome of your opportunity period." *Id.*, Exh. 44, at 1.  Oshiver had refused to meet with Wainman and West, upon the advice of legal counsel, because the topics to be discussed at that meeting allegedly involved the contents of her EEO complaints. *Id.*  The court is satisfied that the suggestion that "adverse impact" would result from Oshiver's refusal to discuss topics she believed were protected EEO matters, along with Wainman's refusal to approve administrative leave so that Oshiver could meet with her attorney, suffices to meet Oshiver's low burden of establishing a nexus between her protected activity and her termination.

Interior's legitimate nondiscriminatory reasons for deciding to terminate Oshiver are numerous and well documented.  Specifically, Interior cites the many negative performance reviews, Oshiver's "results not achieved" rating, her unimproved performance during the PIP period, her failure in two areas of her performance plan, as well as her repeated problems fulfilling the expectations of her supervisors with regard to work timeliness and quality, all of which are supported by record evidence.  Def.'s Mot. at 40–41.

---

history of filing EEO complaints in February 2000, about two months before West filed his removal proposal and about four months before she issued her Decision to Remove memorandum.  This temporal relationship, at least on the part of Wainman, supports the court's conclusion that a *prima facie* case of retaliation is established.

Interior also responded to the suggestion that Wainman's decision to deny administrative leave for Oshiver "showed her retaliatory and discriminatory intent" by noting first that Oshiver did not request the leave until hours before she hoped to take it. Second, after consulting with USGS's personnel office, Wainman requested certain information from Oshiver to ensure that official time could be granted for the leave. Oshiver never provided this information, and accordingly, leave was never approved.

Finally, Interior rebutted Oshiver's allegation that Wainman's March 17, 2000 email demonstrated her retaliatory intent by clarifying a number of points. First, the meeting referred to in the email was the result of Oshiver herself seeking assistance from Wainman, and was not an attempt by Wainman to rebuke Oshiver for participating in the EEO process. *Id.*, Exh. 46 at 3. Second, Wainman thought it was important to meet to discuss Oshiver's concerns with West because she felt it might have a direct impact on "her performance and her performance improvement plan." *Id.* In light of the pending PIP evaluation, Wainman "wanted to meet with [Oshiver] and resolve the issues and provide any necessary clarification . . . regarding [Oshiver's] duties and to determine what assistance, if any, [she] needed." *Id.* Wainman's reference in the email to any possible "adverse impact" was not meant as a threat but rather resulted from her concern that, if Oshiver failed to meet with her supervisors, she "would not receive valuable information and assistance that could help [her] improve [her] performance." *Id.*

In response to these arguments, Oshiver fails to produce sufficient evidence to suggest that Interior's legitimate nondiscriminatory reasons for her termination were pretextual, nor does she dispute Wainman's account of the intent behind her March 2000 email or the denial of

administrative leave.  Simply put, Oshiver has failed to meet her ultimate burden of persuasion

that a genuine issue remains for trial.  She repeatedly asserts that a "reasonable jury" should be

allowed to determine whether her removal was retaliatory, yet fails to introduce any evidence that

the legitimate performance-based reasons supplied by Interior are pretexts for retaliation.  Rather,

she spends approximately twenty pages of her opposition attempting to explain why, in her

estimation, the negative performance evaluations and the "results not achieved" rating were

unreasonable and unwarranted.  Yet, because all of Oshiver's arguments are merely attempts to

rationalize her poor performance,[21] and fail to indicate that Interior was improperly motivated by

Oshiver's previous EEO activity or that its reasons for the termination were lies, summary

judgment is appropriate.  As the Supreme Court has stated, an employer is entitled to judgment

as a matter of law "if the record conclusively revealed some other nondiscriminatory reason for

the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the

---

[21]     For example, Oshiver, *inter alia*, argues that West made too "much out of one allegedly
missed deadline," Pl.'s Opp'n at 22; that no "rational manager" would have assigned a certain
task to Oshiver, *id.* at 26; that certain assignments were "unreasonable," *id.* at 28; that
assignments were explained by "brief emails," *id.* at 31; that the fact that West had to correct one
of Oshiver's "so-called errors . . . himself" does not reflect poorly on her, *id.* at 37; that West
knew certain time constraints were "unreasonable," *id.* at 38; that, despite what her supervisor
indicated, it was acceptable that a portion of a report Oshiver wrote was "handwritten, because
her computer was not functioning," *id.* at 40; that certain mistakes were "an accident, and not
grounds for challenging competence," *id.* at 41; that it is somehow relevant that West "does not
assert Ms. Oshiver was inaccurate; he asserts [her performance] probably was not accurate," *id.*;
and that West should have been more "specific about what he wanted," *id.* at 44.
        These unsupported allegations fail to give rise to a genuine dispute regarding whether the
real intent underlying either the extensive list of complaints in the performance evaluation and
the decision to place Oshiver on a PIP was retaliatory in nature.  *See Vasilevsky*, 31 F. Supp. 2d
at 150 (the plaintiff's arguments "truly misse[d] the point," when she "quibble[d]" about relative
qualifications, rather than "put forth evidence of discrimination.") (quotation omitted).

employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination has occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

13.  *Deficiencies in Investigation and Resolution of Oshiver's EEO Complaints*

In her complaint, Oshiver also alleges that there were deficiencies in the EEO investigation that followed her termination, *Oshiver III*, Compl. ¶ 35, that the Final Agency Decision by the Director of the Office of Equal Opportunity improperly dismissed two of her EEO complaints, *id.* ¶ 38, and that Interior's Acting Assistant Secretary for Policy Management and Budget improperly refused to reverse the termination decision.  *Id.* ¶ 37.  Oshiver never addresses or disputes Interior's argument that the investigation and resolution of her administrative complaints are not employment or personnel actions and are not properly the basis for a Title VII or ADEA action.  *See Keeley v. Small*, 391 F. Supp. 2d 30, 34 (D.D.C. 2005); *Jordan v. Summers*, 205 F.3d 337, 342 (7th Cir. 2000) ("Federal employees do not have a cause of action for a claim that an employer failed to properly process an EEO complaint."). Accordingly, Interior is entitled to summary judgment on these claims.

**B.  Plaintiff's Hostile Work Environment Claim**

A hostile work environment exists "when workplace conditions are so suffused with 'discriminatory intimidation, ridicule and insult' of such 'sever[ity] or pervasive[ness] as to alter the conditions of the victim's employment." *Hussain v. Principi*, 344 F. Supp. 2d 86, 107 (D.D.C. 2004) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).  To establish a viable claim, a plaintiff must show not only that he experienced harassment in the workplace, but

that such harassment arose *because of* the plaintiff's sex, religion, age, or, possibly, previous EEO activity. *Ware*, 344 F. Supp. 2d at 71 n.1 (citing *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002)); *see also Benham v. Powell*, 2004 U.S. Dist. LEXIS 27537, at *15 (D.D.C. April 13, 2004) (discussing the questionable viability of a hostile work environment claim based on retaliation). In determining whether the plaintiff has satisfied this requirement, the court must consider all relevant circumstances, including the frequency and severity of the conduct at issue, "whether it is physically threatening or humiliating, or a mere offensive utterance," and whether the alleged abuse "'unreasonably interferes with an employee's work performance.'" *Curry v. District of Columbia,* 195 F.3d 654, 663 n.16 (D.C. Cir. 1999) (quoting *Harris*, 510 U.S. at 23).

The D.C. Circuit has explained that "[n]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable," *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999). Even conduct that "reflect[s] poorly upon the professionalism" of the defendant's employees may not be severe and pervasive enough to create an abusive environment. *Id.* at 1348. The Supreme Court has consistently reiterated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and quotation omitted); *see also Park v. Howard University,* 71 F.3d 904, 906 (D.C. Cir. 1995) ("casual or isolated manifestations of a discriminatory environment" will not provide a sufficient basis for a hostile work environment claim). The standard for determining a hostile work environment is intentionally "demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)).

34

Here, Oshiver has failed to allege circumstances sufficient to support a hostile work environment claim. She alleges workplace incidents that can neither be characterized as "discriminatory intimidation, ridicule and insult" nor "severe or pervasive." *Harris*, 510 U.S. at 21. To establish her hostile work environment claim, Oshiver relies on her previous allegations of disparate treatment, such as the "degradation and derogation" of her duties and the denial of the congressional detail. In addition, Oshiver also cites the following incidents in support of her hostile work environment claim: (1) West's use of profanity one time after Oshiver could not find a document; (2) West's criticism of Oshiver's work in an email to several of her co-workers; (3) West's requirement that Oshiver provide medical verification for her sick leave; (4) an invitation to, and request to provide food for, a Christmas party in 1999;[22] and (5) the prominent display of a creche on a co-worker's desk. Pl.'s Opp'n at 14–18.

As a preliminary matter, there is no suggestion that any of the incidents described above were the result of Oshiver's status. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003). For example, Oshiver provides no evidence to suggest that West's use of profanity, his email suggesting that Oshiver's work was unprofessional, or his requests for medical verification were in response to Oshiver's gender, age, religion, or previous EEO activity. Nor does Oshiver allege that the Christmas party was organized, or the creche displayed, with any intention to

---

[22]    Oshiver makes a passing reference in her opposition that her allegations involving the Christmas party also qualify as a discrete act of religious discrimination, Pl.'s Opp'n at 16 n.8, despite the fact that her complaint alleges that the office Christmas party created a "hostile and discriminatory *environment*." *Oshiver III*, Compl. ¶ 27 (emphasis added). Regardless, the invitation to an office party, even one meant to celebrate a religious belief with which an employee does not agree, does not constitute a "significant change in employment status" so as to sustain a discrimination claim on the basis of religion. *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).

discriminate against her or to otherwise make her uncomfortable.  For that matter, Oshiver cites

no evidence that her co-workers were even aware that she was Jewish, much less motivated by

that fact when they invited her to the Christmas party and asked her to contribute food.  Without

more, these incidents are "ordinary tribulations of the workplace" and do not give rise to a hostile

work environment claim.  *Faragher*, 524 U.S. at 788.

Even if the court felt comfortable inferring discriminatory or retaliatory intent from the

above incidents, which it does not, they merely involve the daily interactions between Oshiver

and others at Interior.  Nothing identified by Oshiver in her complaints or in her exhibits

demonstrates abusive conduct severe or abusive enough to create a hostile work environment.

Although some of the alleged incidents might "reflect poorly upon the professionalism" of

Interior's employees, they certainly do not rise to the level of a workplace "permeated with

discriminatory intimidation, ridicule, and insult" sufficient to constitute an abusive or hostile

environment.  *Barbour*, 181 F.3d at 1348; *Harris*, 510 U.S. at 21.

Based on a complete assessment of the summary-judgment record, no reasonable jury

could conclude that Oshiver suffered a hostile work environment or that her workplace was

permeated with "'discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or

pervasive to alter the conditions of [her] employment and create an abusive working environment

[such that] Title VII is violated.'"  *Gary v. Long*, 59 F.3d 1391, 1395 (D.C. Cir. 1995) (quoting

*Harris*, 510 U.S. at 21).  Interior is, therefore, entitled to summary judgment on Oshiver's hostile

work environment claim.

**III. CONCLUSION**

For the foregoing reasons, the court concludes that Interior's motion for summary

judgment must be granted.  An appropriate order accompanies this memorandum opinion.


Henry H. Kennedy, Jr.
United States District Judge


Dated: December 16, 2005